UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMI STAMPING, LLC,

       Plaintiff,                                 Case No. 14-cv-10176
                                                Hon. Matthew F. Leitman

v.

ACE AMERICAN INSURANCE
COMPANY *et al.*,

       Defendants.
_____/

**ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF #54), (2) GRANTING PLAINTIFF'S MOTIONS FOR LEAVE TO FILE SUPPLEMENTAL BRIEFS (ECF ## 64, 66), (3) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF #55), AND (4) TERMINATING PLAINTIFF'S MOTION TO EXCLUDE DEFENDANT'S EXPERTS (ECF #56) AS MOOT**

In February 2010, Plaintiff AMI Stamping, LLC ("AMI") asked its insurance agent to purchase coverage for certain equipment in which it had acquired a security interest. AMI had several appraisals valuing the equipment at roughly $400,000, but it told its insurance agent that the equipment was valued at only $138,100. AMI's agent then communicated that valuation to Defendant ACE American Insurance Company ("ACE"). In reliance on that valuation, ACE agreed to insure the equipment and set the premium for that coverage.

The equipment was stolen less than two years later, and AMI filed an insurance claim with ACE to recover for the loss of the equipment. Even though

1

AMI had valued the equipment at $138,100 less than twenty-four months earlier, AMI's claim to ACE valued the equipment at $1.9 million and sought payment of that amount.  ACE investigated AMI's claim but did not pay it.  Instead, ACE rescinded coverage on the ground that, among other things, AMI materially misrepresented the true value of the equipment when AMI applied for coverage.

In this action, AMI contends that ACE breached its obligation to provide coverage for the loss of the equipment, and ACE seeks a declaration that it properly rescinded coverage for the equipment.  The Court concludes that ACE's rescission was lawful.  Accordingly, the Court **GRANTS** summary judgment in favor of ACE and **DENIES** AMI's motion for summary judgment.

## I

## A

AMI is a limited liability company.  Its chairman is George Hofmeister ("Hofmeister").  AMI has no employees. (Examination Under Oath ("EUO") of Hofmeister at 4-5, 22-23, ECF #54-4 at 3, 8, Pg. ID 1001, 1006.)  It transacts business through Hofmeister or through employees of Revstone Industries, LLC ("Revstone"), an affiliated company owned by the Hofmeister Family Trust. (*See id.*)

Since at least 2006, Revstone has been a "client" of an independent insurance agency, Todd Associates. (Deposition of Spankie Carolanne at 24, ECF

#54-7 at 8, Pg. ID 1095.)   Revstone works with Todd Associates to purchase insurance for itself and its affiliated entities, including AMI. (*See id.* at 25-26, ECF #54-7 at 9, Pg. ID 1096.)   Todd Associates' employees Todd Fitzpatrick ("Fitzpatrick") and Spankie Carolanne ("Carolanne") service the Revstone account.  Fitzpatrick is a "producer." (*Id.* at 40, ECF #54-7 at 12, Pg. ID 1099.)  In that role, he "goes out and finds businesses that need insurance and brings them to Todd Associates and works to write their insurance." (*Id.*)  He is "considered [Revstone's] insurance agent." (*Id.*)  Carolanne is an "account manager." (*Id.* at 25, ECF #54-7 at 9, Pg. ID 1096.)  In that role, she

> [o]btain[s] insurance based on the risk characteristics that [her clients] have and the exposures that they have, whether it's by line of business for fire or general liability, auto, Workers' Compensation, foreign liability. I market it to various companies, each renewal.  I prepare applications.  I handle general correspondence and all incoming telephone calls from the client regarding their insurance program. I produce proposals for insurance, applications for insurance. I counsel the insured when they have questions about insurance.

(*Id.* at 26, ECF #54-7 at 9, Pg. ID 1096.)  Carolanne became Revstone's "account manager" in 2009. (*See id.* at 24-25, ECF #54-7 at 8-9, Pg. ID 1095-96.)

In 2009, Carolanne marketed the insurance account for Revstone (and Revstone's affiliated entities like AMI) to at least seven different insurance companies. (*See id.* at 109-110, ECF #54-7 at 30, Pg. ID 1117.)  Revstone chose to

3

purchase its insurance from ACE. (*See id.*)  ACE thereafter issued an insurance policy to Revstone (the "Policy"). (*See* ECF ## 54-1, 54-2.)

**B**

In late 2009 or early 2010, AMI obtained a security interest in real property and equipment located at 4300 Cabot Street in Detroit, Michigan. (*See* ECF #54-14 at 3, Pg. ID 1339; *see also* Hofmeister EUO at 34, ECF #54-4 at 11, Pg. ID 1009.) AMI, through Revstone, then sought to insure the equipment (the "Cabot Street Equipment").  On February 11, 2010, Revstone's assistant general counsel, Kiel Smith ("Smith"), asked Carolanne to add coverage for the Cabot Street Equipment to the Policy. (*See* ECF #54-14 at 3, Pg. ID 1339.)  Carolanne told Smith that in order to obtain that coverage, he would need to provide the value of the equipment. (*See id.* at 2, Pg. ID 1338.)  Carolanne required that information so that she could "determine the proper insurance values to report to [ACE]." (Carolanne Dep. at 51, ECF #54-7 at 15, Pg. ID 1102.)

In response to Carolanne's request, Smith sent her a document that he called an "[a]ppraisal of the equipment." (ECF #54-14 at 2, Pg. ID 1338.)  Smith's "appraisal" identified and listed a value for each piece of the Cabot Street Equipment. (*See* ECF #54-15.)  Smith listed the total value of the Cabot Street Equipment as $138,100. (*See id.* at 3, Pg. ID 1343.)  Notably, at the time Smith provided Carolanne with the $138,100 valuation for the Cabot Street Equipment,

4

AMI had in its files appraisals from 2006 that valued the equipment at between $385,450 and $462,800 (the "2006 Equipment Appraisals"). (*See* Hofmeister EUO at 34-35, 52-53, ECF #54-4 at 11, 15, Pg. ID 1009, 1013; ECF ## 54-13 at ¶ 17, Pg. ID 1334.)[1]

Once Carolanne received the $138,100 valuation, she contacted ACE underwriter Vito Maniaci ("Maniaci"). (*See* ECF #54-17 at 3, Pg. ID 1348.)  She told Maniaci that based on the information she received from Smith, "the value of the [Cabot Street Equipment] is $138,100 (per appraisal)." (*Id.*)  Maniaci "rel[ied] on [the] information from Carolanne" in order to determine what premium to charge and on what other terms ACE would agree to insure the Cabot Street Equipment. (Maniaci Dep. at 68, ECF #54-8 at 19, Pg. ID 1137.)  ACE thereafter agreed to add to the Policy an endorsement for the Cabot Street Equipment (the "Equipment Endorsement"). (*See* ECF #54-1 at 37, Pg. ID 902.)  ACE charged an additional premium of $1,357.00 for the Equipment Endorsement. (*See id.*)

---

[1] At his EUO, Hofmeister testified that in 2006, he had a national appraisal firm, Koster Brothers, "do an appraisal" of the Cabot Street Equipment. (Hofmeister EUO at 34-35, ECF #54-4 at 11, Pg. ID 1009.)  Additionally, in its discovery responses in this action, AMI acknowledged that when it purchased insurance for the Cabot Street Equipment in February 2010, it was aware of two prior appraisals of the equipment: the Koster Brothers appraisal and a second appraisal it obtained from the previous owner of the equipment. (*See* ECF #54-13 at ¶ 17, Pg. ID 1334.) These appraisals – which include values for the Cabot Street Equipment and other property at the Cabot Street location which was not stolen – are in the record at ECF ## 54-19 and 54-20.

5

In early 2012, the Cabot Street Equipment was stolen.  AMI (again, through Smith) then submitted an insurance claim to ACE to recover the value of the equipment. (*See* Smith Dep. at 116, ECF #54-5 at 32, Pg. ID 1054.)   In communications with ACE related to the claim, AMI acknowledged that its previous representation of the equipment's value – $138,100 – was inaccurate. (*See* ACE Counterclaim at ¶ 20, ECF #2 at 27, Pg. ID 49 and AMI Ans. to Counterclaim at ¶ 20, ECF #11 at 5, Pg. ID 369.)[2]  AMI asserted that the value of the equipment was actually $1.9 million – nearly 14-times more than the $138,100 value it reported when it applied for coverage – and AMI's claim to ACE sought

---

[2] In paragraph 20 of its Counterclaim, ACE alleged that "[o]n February 21, 2013 AMI advised ACE that the $138,100.00 valuation of the property stolen from the 4300 Cabot Street location was incorrect and that it would provide a revised appraisal of the value of the stolen property." (ACE Counterclaim at ¶ 20, ECF #2 at 27, Pg. ID 49.) AMI answered this allegation as follows: "In response to Paragraph 20, Plaintiff/Counter-Defendants [sic] admit that it provided additional information to ACE regarding the value of the property that had been stolen from the Cabbott [sic] Street address." (AMI Ans. to Counterclaim at ¶ 20, ECF #11 at 5, Pg. ID 369.)  AMI did not deny the allegation that it "advised" ACE that the $138,100 valuation of the Cabot Street Equipment was "incorrect."  Therefore, that allegation is deemed admitted. *See* Fed R. Civ. P. 8(b)(6) ("An allegation … is admitted if a responsive pleading is required and the allegation is not denied."). *See also United States v. Vehicle 2007 Mack Dump Truck*, 680 F. Supp. 2d 816, 826 (E.D. Mich. 2010) (deeming allegations in amended complaint as admitted because claimants' answers failed to comply with Rule 8(b)(6)).  Thus, AMI has admitted saying that its $138,100 valuation was inaccurate, and that concession is highly relevant, is admissible against AMI as substantive evidence, and may be considered by the Court in resolving the pending motions. *See* Fed. Rules Evid. 401, 402, 801(d)(2)(A).

compensation in that amount. (*See* Appraisal, ECF #55-6; *see also* Smith Dep. at 145-147, ECF #54-5 at 39-40, Pg. ID 1061-62.)

On November 13, 2013, ACE formally denied AMI's insurance claim by written letter. (*See* ECF #54-18.)   Through that correspondence, ACE also informed AMI that it was rescinding the Equipment Endorsement and would be returning AMI's premiums for that endorsement. (*See id.*)   ACE told AMI that it was rescinding the Equipment Endorsement because, among other things, AMI misrepresented the value of the Cabot Street Equipment when it applied for coverage:

> As a result of AMI's misrepresentations to ACE regarding … the value of the machinery and equipment at the 4300 Cabot Street, Detroit, Michigan, location ACE rescinds the coverage it provided for the 4300 Cabot Street location. …. The premium charged for that coverage totaled $2,856.00.  Confirming the rescission of coverage for the 4300 Cabot Street location, ACE is sending AMI Stamping, LLC a check in that amount under separate cover.

(*Id.* at 5, Pg. ID 1353.)

## II

On December 20, 2013, AMI filed this action against ACE in Wayne County Circuit Court. (*See* ECF #1-2.)   Among other things, AMI alleges that ACE breached the Equipment Endorsement when it denied AMI's insurance claim. (*See id.*)   ACE thereafter removed AMI's Complaint to this Court. (*See* ECF #1.)

ACE also filed a Counterclaim in which it seeks a declaratory judgment that it properly rescinded the Equipment Endorsement based, in part, on AMI's alleged misrepresentations about the value of the Cabot Street Equipment. (*See* ECF #2.) AMI filed an Answer to the Counterclaim on February 18, 2014. (*See* ECF #11.) Both parties have now moved for summary judgment. (*See* ECF ## 54, 55.)  The Court held a hearing on the motions on July 20, 2016.

### III

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52.  Indeed, "[c]redibility determinations, the weighing of the evidence and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

8

# IV

ACE argues that it had the right to rescind the Equipment Endorsement because AMI misrepresented the value of the Cabot Street Equipment.  The Court agrees.

It is "well-settled" under Michigan law that "where an insured makes a material misrepresentation in the application for insurance … the insurer is entitled to rescind the policy and declare it *void ab initio*." *Lake States Ins. Co. v. Wilson*, 586 N.W.2d 113, 115 (Mich. App. 1998). *See also Campbell v. Liberty Mut. Grp.*, 10-14179, 2011 WL 2447506, at *3-4 (E.D. Mich. June 14, 2011) (holding that insurance company "properly rescinded [p]laintiff's policy of insurance" based on misrepresentations plaintiff made in application process).  An insurer is entitled to rescind coverage even where the misrepresentation was unintentional.  Indeed, "[r]escission is justified without regard to the intentional nature of the misrepresentation as long as it relied upon by the insurer." *Lake States*, 586 N.W.2d at 115.  In this action, then, ACE is entitled to "a declaration that [its] rescission was proper" if it can establish "(i) that [AMI] made a misrepresentation on [its] insurance application, (ii) that the misrepresentation was material, and (iii) that [ACE] relied on the misrepresentation." *Zayour v. Liberty Mt. Ins. Co.*, 12-11926, 2014 WL 3611766, at *5 (E.D. Mich. July 22, 2014.)

9

All of these elements are satisfied here. First, AMI misrepresented the value of the Cabot Street Equipment when it applied for insurance coverage. As described above, AMI has admitted that the $138,100 valuation it provided to ACE was inaccurate. (*See* ACE Counterclaim at ¶ 20, ECF #2 at 27, Pg. ID 49 and AMI Ans. to Counterclaim at ¶ 20, ECF #11 at 5, Pg. ID 369.) AMI's admission makes perfect sense because by any measure, AMI's $138,100 stated valuation was erroneous. Indeed, AMI has appraisals showing that as of 2006 the liquidation and fair market values of the Cabot Street Equipment were at least $385,450, and as much as $462,800. (*See* Hofmeister EUO at 34-35, 52-53, ECF #54-4 at 11, 15, Pg. ID 1009, 1013; ECF # 54-13 at ¶ 17, Pg. ID 1334; *see also* ECF ## 54-19, 54-20.) And AMI's most recent appraisal of the Cabot Street Equipment reflects a replacement cost value of $1.9 million. (*See* Appraisal, ECF #55-6.) Thus, AMI's stated valuation of $138,100 was far less than the value of the Cabot Street Equipment as determined under three widely-accepted valuation methods.

Second, AMI's misrepresentation of the value of the Cabot Street Equipment was material. "A misrepresentation on an insurance application is material if, given the correct, information, the insurer would have rejected the risk or changed an increased premium." *Hatcher v. Nationwide Prop. & Cas. Ins. Co.*, 34 F. Supp. 3d 704, 708 (E.D. Mich. 2014) (quoting *Montgomery v. Fid. & Guar. Life. Ins. Co.*, 713 N.W.2d 801, 804 (Mich. Ct. App. 2005)). That is true here. As

Carolanne explained, the premium for the type of coverage purchased by AMI "is based on a rate times the value of the property." (Carolanne Dep. at 53, ECF #54-7 at 16, Pg. ID 1103.)   And Maniaci confirmed that the premium is based on the "value[]" of the property being insured. (Maniaci Dep. at 37, ECF #54-8 at 11, Pg. ID 1129.)   Simply put, ACE would have charged a higher premium for the Equipment Endorsement if AMI had provided ACE the accurate value of the Cabot Street Equipment.   Thus, AMI's false statement that the value of the equipment was $138,100 was material.

Finally, ACE relied upon AMI's misrepresentation.   As Maniaci explained, he "relied on [the] information from Carolanne" – i.e., the valuation of the Cabot Street Equipment that she received from Smith – when he underwrote the Equipment Endorsement. (Maniaci Dep. at 68, ECF #54-8 at 19, Pg. ID 1137; *see also id.* at 13, 46, ECF #54-8 at 5, 14, Pg. ID 1123, 1132.)   Therefore, ACE was entitled to rescind the Equipment Endorsement.

## V

AMI offers several arguments as to why ACE had no right to rescind the Equipment Endorsement.   None are persuasive.

## A

AMI first argues that ACE was not entitled to rescind the Equipment Endorsement because ACE knew that the represented value of $138,100 was

11

inaccurate and thus could not have, and did not, rely on that erroneous valuation.[3]
This argument rests on three premises: (1) Carolanne was ACE's agent, not AMI's
agent, when AMI applied for the Equipment Endorsement, (2) at that time,
Carolanne had, or was aware of, the 2006 Equipment Appraisals that valued the
Cabot Street Equipment at roughly $400,000, and (3) Carolanne's knowledge of
the higher appraisals can be imputed to ACE. All three premises are wrong.

## 1

Carolanne was AMI's agent, not ACE's agent, when AMI applied for the
Equipment Endorsement. Michigan law is clear: "when an insurance policy is
facilitated by an independent insurance agent or broker … the independent
insurance agent is considered an agent of an insured rather than an agent of the
insurer." *Stone v. Auto-Owners Ins. Co.*, 858 N.W.2d 765, 772 (Mich. Ct. App.
2014). An insurance agent is "independent" if the agent has "the power to place
insurance with various insurance companies." *Harwood v. Auto-Owners Ins. Co.*,
535 N.W.2d 207, 209 (Mich. Ct. App. 1995); s*ee also Mate v. Wolverine Mut. Ins.
Co.*, 592 N.W.2d 379, 382 (Mich. Ct. App. 1998) (testimony that insurance agency
had the "power to place insurance with various insurance companies" is "usually

---

[3] AMI primarily makes this argument in a section of its briefing that relates to
other knowledge ACE may have had about the Cabot Street location. (*See* AMI
Mot. at 14-23, ECF #55 at 16-24, Pg. ID 1427-35; *see also* AMI Resp. Br. at 7-8,
ECF #58 at 10-11, Pg. ID 1746-47.) Viewing the briefing in the light most
favorable to AMI, it also appears that AMI intended to make this argument with
respect to the representation that the Cabot Street Equipment had a $138,100 value.

sufficient to establish that an independent insurance agent is the agent of the insured, not the insurer.").

Here, the undisputed evidence establishes that Carolanne had the power to place Revstone's coverage – which included coverage for Revstone's affiliated entities like AMI – "with various insurance companies."  In unrebutted testimony, she explained that she marketed Revstone's "insurance program" to at least seven different insurance companies, including ACE. (Carolanne Dep. at 109-110, ECF #54-7 at 30, Pg. ID 1117.)  She also testified that she performed the functions of an "independent agent."[4] (*Id.* at 88, ECF #54-7 at 24, Pg. ID 1111.)  Carolanne was thus an "independent agent," and, as such, served as AMI's agent, not ACE's agent, in connection with AMI's application for coverage.

Other evidence confirms that Carolanne and the agency that employed her, Todd Associates, were not ACE's agent.  For instance, Carolanne identified her co-worker, Fitzpatrick, as Revstone's "insurance agent." (*Id.* at 40, ECF #54-7 at 12, 1099.)  She also testified that Revstone was a "client" of Todd Associates. (*Id.* at

---

[4] In this same portion of her deposition, Carolanne testified that she was an "authorized representative of any insurance company that [Todd Associates] has a contract with," including ACE. (Carolanne Dep. at 87, ECF #54-7 at 24, Pg. ID 1111.)  But this testimony does not create a material factual dispute with respect to whether, under Michigan law, Carolanne was ACE's agent.  Indeed, her testimony makes clear that she places insurance with multiple *different* insurance companies, which is the definition of an "independent insurance agent" under the Michigan law quoted in text above.

13

24, ECF #54-7 at 8, Pg. ID 1095.)   And AMI's Answer to ACE's Counterclaim even referred to Carolanne as "its agent." (*See* AMI Ans. to Counterclaim at ¶ 25, ECF #11 at 6, Pg. ID 370.)   These points underscore that Carolanne and Todd Associates were agents of AMI, not ACE.

AMI counters that Carolanne was ACE's agent because Todd Associates entered into a "Producer Agreement" with ACE in which Todd Associates acknowledged that it was ACE's "*agent*." (Producer Agmt. at § 1, ¶ A, ECF #61-1 at 2, Pg. ID 1858; emphasis in original).   But the Producer Agreement did not become effective until June 1, 2010 (*id.* at § VII, ECF #61-1 at 8, Pg. ID 1864), and thus it says *nothing* about whether Todd Associates was ACE's agent in February 2010 when AMI applied for the Equipment Endorsement.   Moreover, the Producer Agreement does not cover Todd Associates' efforts to obtain property insurance like the Equipment Endorsement.   It applies only to Todd Associates' "accident and health" line of business.[5]   Thus, the Producer Agreement did not transform Carolanne into ACE's agent.

Finally, in a supplemental brief that AMI sought to file on the eve of the summary judgment hearing, AMI argued that Carolanne should be deemed ACE's

---

[5] The Producer Agreement provides that Todd Associates was authorized "to act on [ACE's] behalf *only* as set forth in Addendum A – Underwriting Authority." (Producer Agmt. at § 1, ¶ C, ECF #61-1 at 2, Pg. ID 1858; emphasis in original.) That addendum authorized Todd Associates to act as ACE's agent with respect to the "accident and health" line of business only. (ECF #40-1 at 8, Pg. ID 737.)

agent by operation of *Ohio* law. (*See* Mot. for Leave to File Supp. Br., ECF #64.[6]) AMI's invocation of Ohio law stands in sharp contrast to its earlier invocation of Michigan law and its earlier suggestion that the Court should analyze Carolanne's agency status under Michigan law. (*See* AMI Mot. at 16, 22-23, ECF #55 at 18, 24-25, Pg. ID 1429, 1435-36; AMI Resp. Br. at 3-4, ECF #58 at 6-7, Pg. ID 1742-43.) Moreover, AMI's supplemental brief does not contain any choice of law analysis. AMI simply asserts that the Court should apply Ohio law because Carolanne is licensed in Ohio – a fact AMI knew when it earlier urged the Court to apply Michigan law.[7] But AMI cites no authority for the proposition that the law of the state in which an insurance agent is licensed governs the question of who the agent represents in a particular transaction. Simply put, AMI has failed to show that questions concerning Carolanne's agency should be governed by Ohio law.

**2**

There is no evidence that at the time Carolanne helped AMI apply for the Equipment Endorsement, she knew that AMI's $138,100 valuation of the Cabot Street Equipment was incorrect. AMI counters that she must have known of the inaccuracy because she had, or was aware of, the 2006 Equipment Appraisals

---

[6] The Court **GRANTS** AMI leave to file this supplemental brief.

[7] During her deposition, which took place before the parties submitted their motions and briefs to the Court, Carolanne testified that she was licensed in Ohio. (*See* Carolanne Dep. at 28-29, ECF #54-7 at 9-10, Pg. ID 1098-99.)

showing the much higher values. (*See* AMI Resp. Br. at 15, ECF #58 at 18, Pg. ID 1754.)  But AMI cites *no* evidence to support its claim that Carolanne had the earlier appraisals (*id.*), and the Court has found none.  Thus, there is no support for AMI's assertion that Carolanne knew that the $138,100 valuation was wrong at the time ACE issued the Equipment Endorsement.

### 3

In any event, AMI lacks authority for its argument that Carolanne's knowledge can be imputed to ACE.  AMI insists that a series of Michigan Supreme Court decisions – *Gordon v. St. Paul Fire & Marine Ins. Co.*, 163 N.W. 956 (Mich. 1917), *Jacobs v. Queen Ins. Co.*, 150 N.W. 147 (Mich. 1914), and *Hawkeye Casualty Co. v. Holcomb*, 5 N.W.2d 477 (Mich. 1942) – compel the conclusion that ACE should be deemed to have Carolanne's knowledge. (*See* AMI Mot. at 16, ECF #55 at 18, Pg. ID 1429; AMI Resp. Br. at 7-8, ECF #58 at 10-11, Pg. ID 1746-47.)  But those decisions are inapposite.  They do not address whether an insurance carrier is deemed to have knowledge of facts known by an *independent* agent like Carolanne.  Instead, they address whether facts known to a "general local agent" should be imputed to an insurance carrier. *See, e.g.*, *Jacobs*, 150 N.W. at 151; *Hawkeye Cas. Co.*, 5 N.W.2d at 482.  In *Jacobs*, the Michigan Supreme Court defined such an agent as "one who has the power to solicit insurance, to receive applications, to fix premiums, to accept risks, and to issue, countersign, and

renew policies in a particular locality." *Jacobs*, 150 N.W. at 151.[8] Here, there is no evidence that ACE granted such power to Carolanne or anybody else at Todd Associates.   On the contrary, it is undisputed that Maniaci, *not* Carolanne, underwrote AMI's application to cover the Cabot Street Equipment, determined whether to approve coverage, and fixed the premium. (*See, e.g.*, Maniaci Dep. at 68, ECF #54-8 at 19, Pg. ID 1137.)   Simply put, Carolanne and Todd Associates were not the type of "general local agents" involved in *Jacobs*, *Hawkeye Cas. Co.*, and *Gordon*, and thus, contrary to AMI's argument, those decisions do not compel the conclusion that Carolanne's knowledge should be imputed to ACE.[9]

## B

AMI next argues that ACE had no authority to rescind the Equipment Endorsement because any misrepresentation concerning the value of the Cabot Street Equipment was unintentional.   In support, AMI relies upon two provisions of the Policy.

---

[8] *See also Hawkeye Cas. Co.*, 5 N.W.2d at 481-82 (recognizing rule that knowledge of insurance agent is imputed to insurance carrier where the carrier has authorized the agent "to issue policies simply by signing his name as an agent, to collect premiums, and to cancel policies without consulting the home office….")

[9] To be clear, the Court has concluded that there is no evidence that Carolanne knew the $138,100 valuation was inaccurate. (See Section V.A.2. above.)   The discussion above is intended to underscore AMI's failure to establish that if she did know, that knowledge would be imputed to ACE.

17

First, AMI directs the Court to the "Unintentional Errors and Omissions Endorsement."  It provides:

> It is hereby understood and agreed that the failure of the Insured to disclose all hazards existing as of the inception date of the Policy shall not prejudice the Insureds with respect to the coverage afforded by this Policy, provided such failure or any omission is not intentional.  When discovered, the unintentional error or omission shall be reported to the Company as soon as practicable.

(ECF #61-3 at 2, Pg. ID 1869.)  AMI maintains that because any misrepresentation concerning the value of the Cabot Street Equipment was not intentional, it should not "prejudice" AMI's right to continued coverage. (*See* AMI Reply Br. at 2-4, ECF #61 at 2-4, Pg. ID 1850-52.)   But this endorsement does not apply to misrepresentations concerning the value of property to be insured.  It is strictly limited to an insured's failure to disclose "hazards."  This endorsement is thus no help to AMI.

Second, AMI argues that the "Commercial Property Conditions" provision of the Policy precludes ACE from rescinding coverage based upon unintentional misrepresentations. (*See id.*) That provision provides:

> A.   Concealment, Misrepresentation or Fraud
>
> This Coverage Part is void in any case of fraud by you as it related to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

18

1.      This Coverage Part;
2.      The Covered Property;
3.      Your interest in the Covered Property; or
4.      A claim under this Coverage Part.

(ECF #61-4 at 2, Pg. ID 1871.)  AMI in effect argues that when ACE agreed to this provision authorizing rescission for *intentional* misrepresentations, it waived its right under Michigan common law (discussed above at Section IV) to rescind coverage based on *unintentional* misrepresentations.

Another judge of this court considered and rejected such an argument in *Seneca Specialty Ins. Co. v. West Chicago Property Co.*, 08-12335, 2010 WL 431734 (E.D. Mich. Feb. 2, 2010.)  In *Seneca Specialty*, the plaintiff purchased an insurance policy from the defendant insurer.  During the application process, the plaintiff represented that that there had been no claims or losses with respect to the building being insured within the previous five years. *See id.* at *1.   That representation was not accurate. *See id.*   After the plaintiff made an insurance claim under the policy, the defendant-insurer rescinded the policy based on the alleged "material misrepresentations that were made in the policy's application." *Id.*   At the summary judgment stage, the plaintiff-insured "contend[ed] that the inaccuracies [in the application] [were] not misrepresentations justifying rescission because they were not made intentionally." *Id.* at *2.   The insured contended that because there was "language in the insurance contract" allowing rescission based

19

upon an intentional misrepresentation, the insurer had no right to rescind based on an innocent misrepresentation. *Id.* at \*2. The court rejected that argument:

> *This argument fails because [the insurer's] right to void the contract ab initio in cases of unintentional misrepresentations exists completely separate from the terms of the contract itself.* Furthermore, [the insured] has pointed to no caselaw indicating that this right is waived by contract language such as that present in this case.
>
> In addition, nothing in the language of this contract forfeits [the insurer's] right to void *ab initio* in cases like this. The contract's statement that [the insurer] can void the contract at any time in cases of intentional misrepresentation is merely an additional right of rescission that is being granted to [the insurer]. Accordingly, the Court will follow Michigan law and find that whether the misrepresentation was intentional is irrelevant to [the insurer's] right to void the contract *ab initio*.

*Id.* (emphasis added; internal citation omitted).

AMI has provided no persuasive reason to depart from the reasoning and conclusion in *Seneca Specialty*. Moreover, *Seneca Specialty* appears consistent with Michigan law. For instance, in *Hansman v. Imlay City State Bank*, 328 N.W.2d 653, 655-56 (Mich. Ct. App. 1983), the Michigan Court of Appeals held that a bank did not waive its common law right of setoff by entering into a security agreement that provided, in part, that the bank "expressly waiv[ed] all other security" for a loan. The court declined to find a waiver of the common law right because the agreement was "executed under normal business practices," and the

20

court saw no evidence that the bank intended to waive its common law setoff right by entering into a standard agreement. *Id.*   Although *Hansman* is factually distinguishable, it does lend support to the *Seneca Specialty* court's refusal to find a waiver of common law rescission rights in a standard policy provision concerning rescission.[10]   Finally, "a waiver is a voluntary and intentional abandonment of a known right," *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003), and there is no clear evidence that ACE intended to waive its common-law right to rescind the Policy based on innocent misrepresentations.[11]   Because AMI has not shown any error in the *Seneca Specialty* court's analysis, this Court follows that decision and holds that ACE has not waived its common right to rescind coverage based upon innocent misrepresentations.

## C

Finally, AMI faults ACE for not confirming during the underwriting process that AMI's $138,100 valuation (supplied through Carolanne) represented the replacement cost value of the Cabot Street Equipment.   AMI stresses that the

---

[10] *See also Mayes v. Matthews IV*, 2011 WL 5964615, at *3 (Mich. Ct. App. Nov. 29, 2011) (explaining that "the fact that [a] contract includes a provision that specifically mentions [one remedy] does not mean that [a party] intended to limit his remedy [to the specifically mentioned remedy].")

[11] Notably, AMI did not submit an affidavit or other evidence indicating that when it purchased the Policy, it believed that ACE had waived its common law right to rescind based upon innocent misrepresentations during the application.

21

Policy provided replacement cost coverage for the equipment; that given the "nature" of the equipment, it should have been clear to Maniaci that the $138,100 valuation could not represent its replacement cost; that it was unreasonable for Maniaci to "assume" that the $138,100 value represented replacement cost; and that Maniaci's unreasonableness precludes ACE from rescinding coverage on the ground that the $138,100 valuation was inaccurate. (*See* Supp. Br., ECF #66.[12])

However, AMI has not cited any legal authority to support its assertions that (1) Maniaci had an obligation to confirm that the values provided by AMI (through Carolanne, which she received from Smith) represented the replacement cost of the equipment and/or (2) Maniaci's failure to confirm negates ACE's right to rescind.

Moreover, given the course of dealings between Maniaci and Carolanne, it was not unreasonable for Maniaci to believe that the $138,100 valuation provided by Carolanne represented the replacement cost for the equipment.  Maniaci had previously "discuss[ed]" with Carolanne that when dealing with replacement cost policies, the relevant "value[s] should be at replacement cost." (Maniaci Dep. at 128, ECF #54-8 at 34, Pg. ID 1152; *see also id.* at 134-35, ECF #54-8 at 36, Pg. ID 1154.)  Likewise, Carolanne understood that ACE "typically reqest[ed] values for property to be reported on a replacement cost [] basis." (Carolanne Dep. at 60, ECF #54-7 at 17, Pg. ID 1104.)  And AMI has not presented any evidence that at the

---

[12] AMI has moved for leave to file the supplemental brief cited in text above. (*See* ECF #66.)  The Court **GRANTS** AMI leave to file this supplemental brief.

time Maniaci underwrote the Equipment Endorsement he had any reason to believe that the $138,100 valuation was anything other than at replacement cost.[13]  Under these circumstances, it was not unreasonable for Maniaci to believe that the $138,100 valuation was a replacement cost valuation.

## VI

Because the Court has concluded that ACE was entitled to rescind the Equipment Endorsement, it need not rule on ACE's alternative grounds for summary judgment nor AMI's responses to those grounds.  In addition, because ACE was entitled to rescind the Equipment Endorsement, AMI was not entitled to coverage under that endorsement.  Thus, the Court will deny AMI's summary judgment motion. (ECF #55.)  Finally, the Court will terminate AMI's motion to exclude ACE's expert witnesses (ECF #56) as moot.

## VII

ACE properly rescinded the Equipment Endorsement and is entitled to judgment as a matter of law.  Accordingly, for the reasons stated above, **IT IS HEREBY ORDERED** that:

- ACE's motion for summary judgment (ECF #54) is **GRANTED**;

---

[13]AMI seems to suggest that given the "nature of the equipment," Maniaci had to know that the $138,100 valuation was far too low to represent its true replacement cost value. (*See* AMI Supp. Br. at 2, ECF #66 at 4, Pg. ID 1916.)  But AMI has not identified any evidence in the record to support that assertion.

23

- AMI's motions for leave to file supplemental briefs (ECF ## 64, 66) are **GRANTED**;

- AMI's motion for partial summary judgment (ECF #55) is **DENIED**; and

- AMI's motion to exclude Defendant's expert witnesses is **TERMINATED AS MOOT**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 26, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 26, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113